Cameron H. Totten, Esq. (SBN 180765)
Law Offices of Cameron H. Totten
620 N. Brand Blvd., Ste. 405
Glendale, California  91203
Telephone (818) 483-5795
Facsimile (818) 230-9817
ctotten@ctottenlaw.com


Proposed Attorney for Debtor in Possession Orlanda Cunningham


# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

In re:

ORLANDA CUNNINGHAM,

     Debtor in Possession.

Chapter    11

CASE NO.  09–36912–BR

NOTICE OF FILING OF DISCLOSURE STATEMENT FOR DEBTOR

STATUS CONFERENCE

DATE: January 13, 2009
TIME: 9:30 AM
CTRM: 1668
FLOOR, 16th Roybal


THE HONORABLE BARRY RUSSELL

     ORLANDA CUNNINGHAM, Debtor in Possession ("Debtor"), hereby submits the following Disclosure Statement for her Plan of Reorganization.

1. History of Background of Debtor's Business.

Debtor is a sole proprietor who has been self employed for the past 20 years. She received her State of California Real Estate License in 1989 while she was employed as a business sales representative for Pacific Bell. The Debtor worked part-time for various major real estate companies until she became a full-time real estate sales person for JLA Realty in Westwood. The Debtor's Real Estate License is currently "NBA". This means "No Current Employing Broker". The Debtor has her license for Family Day Care and Foster Care License.

The Debtor purchased her first home in 1994 for $35,000. This property is located at 7214 10th Avenue Los Angeles. This property was in need of a total rehabilitation from the foundation to the roof. The Debtor was credit worthy to qualify for financing and refinance of the loan on this property. The Debtor refinanced this property in September of 2005 for $266,000.00. The Debtor received a sub-prime loan even though she qualified for a prime loan. The funds received from the refinance were used for needed repairs on this and the other properties.

In August 1996, the Debtor purchased the property at 4711-13 4th Avenue, Los Angeles. The property was a bank foreclosure and the Debtor was credit worthy to qualify for the loan. The property was larger than the Debtor needed for her family and plans were formulated to provide services to children and families at the property. The Debtor received her State of California family daycare license in 1997 and she eventually operated a full time daycare facility. The Debtor was licensed for 14 children. The property was large enough to use the downstairs (4713 4th Avenue) fully as a daycare

center and the upstairs (4711 4th Avenue) as her living quarters.

The Debtor received her State of California License foster care business in 1999 for the address 4711 4th Ave (upstairs).  The Debtors' capacity is for six children ages 12-18, boys only.  The Debtor has been at full capacity at various times throughout the past ten years.  The Debtor currently has legal guardianship of three boys ages 13, 14, and 15.  The Debtor refinanced this property in January of 2007 for $750,000.00.  The Debtor received a sub-prime loan even though she qualified for prime financing. The funds from this loan was used to pay-off debts and purchase another property for income purposes.

In May of 2002, the Debtor took over payments of 5728 10th Avenue, Los Angeles, from a friend that was in foreclosure.  The Debtor's biological son moved into the property.  He pays approximately $1,000.00 per month for rent to the Debtor.  The Debtor claimed this property as her second residence.  The property was badly in need of rehabilitation from the foundation to the roof.  The Debtor refinanced this home. With the assistance of her children, most of the repairs were completed except for a pool that was too expensive to fix.

The Debtor purchased 5459 10th Avenue, Los Angeles, in February of 2005 because it was more suitable for the Debtor to live in.  The Debtor was very credit worthy and the financing was affordable.  The Debtor refinanced this property.  The Debtor's daughter was living in 4711-13 4th Avenue, working and paying rent to the Debtor.  Accordingly, the Debtor moved into the 5459 10th Avenue, Los Angeles property.  The Debtor's son and daughter were certified, fingerprinted and trained in CPR/First aid to assist

the Debtor in operating businesses, foster care and daycare.  In 2003, the daycare business was good but with the recent recession, the business activity has declined substantially.  The Debtor believes that it will return to former more profitable levels as the economy improves.

The Debtor and her youngest biological son took a class on operating a sober living business in August of 2006 from the Sober Living Network. Sober Living appeared to present a solid for future business opportunities.

The property at 1851 W. 85th Street, Los Angeles was purchased in August of 2006 for the purpose of operating a sober living home.  The property at 1851 W. 85th Street was first leased to the H.O.W. Foundation which operates transition housing services.  This foundation leased this property for about one year but failed to pay their rental obligation on time. They were asked to leave.

The Debtor purchased 1246 W. 68th Street in April of 2007 because the seller offered her a sale with credit in the financing.  This property was also leased to the H.O.W. Foundation.  They were asked to move because of their neglect to honor their lease agreement.

The Debtor, with the assistance of her son, started operating Sober Living/Transitional Housing homes in 2007.  The Debtor furnished 85th Street home with 20 beds and the 68th Street property with 10 beds.  In February of 2007, the Debtor purchased 5149 7th Avenue for the purpose of opening another Sober Living home.  This home was furnished with 16 beds. The Debtor later moved the sober living clients to the 68th Street property because the capacity was low and she was able to move a private party, her

1    biological daughter, into this property.

2

3        In March of 2007, the Debtor was credit worthy and purchased 2200

4    W 73rd Street, Los Angeles, a duplex, that was to be used for Sober

5    Living/Transitional Housing.  This home was furnished with 30 beds.  The

6    Debtor has received approval from the L.A. County Probation department to

7    house homeless probation participants under a program they were funding.

8    The programs funding ran out in late 2007.

9

10        The Debtor purchased 1814 New England Street, Los Angeles in

11    August 2007, looking at its potential to be resold at a later date for a profit.

12    The Debtor submitted plans and received permits to rehabilitate the property.

13    The property was partially vacant when it was purchased. The Debtor found

14    new tenants.  However, in early 2008, the tenants started having problems

15    paying the rent.  The Debtor presently has two units set up for sober/

16    transitional housing with 10 beds.

17

18        When the housing market started falling in 2007, the Debtor asked for

19    loan modifications from her lenders but was told she was not having a

20    problem because she was paying all her debts timely. The Debtor sought help

21    from professional loan modification companies later in 2008. The Debtor

22    spent approximately $30,000 for loan modification services without results.

23

24        The Debtor has filed litigation against some of these companies and

25    filed State Bar Association complaints against attorney Mark Nelson who

26    defrauded her.  In that regard, the Debtor met with Homeowners Advisory

27    Council of Ontario in May of 2009 for expert help with loan modifications.

28    She was advised a Chapter 11 Bankruptcy would accomplish her need to

1  modify her loans.  She was told that they had an experienced attorney, Mark

2  Nelson, who would make the process quick and efficient.  She was told that

3  she did not need to make any more payments until the bankruptcy was

4  completed. The debtor paid $6,500 for this service.

5

6      The Debtor was contacted by a San Bernardino District Attorney

7  investigator, M. Ladrum, who stated that the principals of Homeowners

8  Advisory Council had been arrested for fraud with a box of her personal

9  papers. The pending criminal case is FSB902405.  The Debtor followed up

10 with Mr. Nelson, the attorney named on her bankruptcy papers.  The Debtor

11 never met Mr. Nelson and never signed any bankruptcy papers for Mr.

12 Nelson.  She never  received any notice of case deficiencies. Later, Mr.

13 Nelson told the Debtor that he was a victim of the owners of HAC also. He

14 represented that he was committed to the case and would complete the

15 filings.  However, he stated he did not have the money to do so.

16 Accordingly, Mr. Nelson was paid another $6,500.00 but did not complete

17 the filing. The Debtor met with attorney Cameron Totten who agreed to

18 assist with her Chapter 11 Bankruptcy.

19

20     The Debtor is basing her reorganization on her Sober Living

21 Transitional Housing business.  Demand for quality sober housing far

22 exceeds supply. That is particularly true for housing that is accessible to

23 those of limited or modest means.  The Debtor has received approvals from

24 local housing agencies, the State of California department of Social Services,

25 State of California Parole, Los Angeles County Probation, Veterans

26 Administration, Los Angeles County Department of Mental Health and

27 various local homeless agencies.

28

The Debtor has developed a reputation for "dignity in living" homes. The sober living housing business has good potential for future growth. Because Sober Loving homes are neither boarding houses nor commercial enterprises, they cannot be classified as such by local governments.  Local governments cannot require zoning or land use permits or restrictions for a residence that is not required to be licensed which is not also imposed on all residences in the jurisdiction.  Therefore, no business license or permit is required by the City of Los Angeles where the properties are located.

Sober Living residences are houses where people abstain from alcohol and drugs and seek a clean and sober living environment. There are no treatment or counseling services given.  The Sober Living Homes are considered the same as any other residential rental.  They exist by right, just as any single family dwelling unit, whether it is a single family home, a unit in a duplex, a large apartment complex, or other types of dwelling units.

Sober living homes are considered nondiscriminatory because the standards apply equally to everyone and are, therefore, generally exempt from the application of fair housing laws.  Federal and state fair housing laws provide protections from housing discrimination for persons with disabilities.

Disabilities, according to fair housing laws, include, but are not limited to, the mentally ill and those addicted to alcohol and other drugs. Housing includes licensed residential treatment programs as well as sober living and other independent living homes where individuals with disabilities reside as a family for an extended period as opposed to an overnight or "hotel" situation.

The Debtor's facilities are designed to be a sober/ transitional living situation, helping people rehabilitate back into society, back to their families, and on to reach their God given potential.  The Debtor sets no time limit for this transition. All residents are expected to have completed a treatment program or are to be currently in an outpatient program. Transitional housing clients do not have these requirements but must be committed to practice sobriety.

2.    Assets of the Business.

The Debtor is engaged in a sober living business, child care and rental housing. The properties utilized for sober living and child care are:

Property Address,  Total Beds, Income at Full Capacity and Current level:

| Property Address | Total Beds | Income at Full Capacity | Current level |
|---|---|---|---|
| 2200 W 73rd 5t, | 20 sober living beds, | $8,000.00 | $4,000.00 |
| 1246 W 64th 5t | 10 sober living beds, | $4,000.00 | $2,000.00 |
| 1851 W 85th 5t | 20 sober living beds, | $8,000.00 | $4,000.00 |
| 1814-16 New England St | 10 sbr. liv. beds, | $4,000.00 | $1,600.00 |
| 1818-20 New England St., | Private rentals, | $2,450.00 | $2,450.00 |
| 5459 10th Ave | SFR private rental | $1,800.00, | $1,800.00 |
| 5728 10th Ave | SFR private rental | $1,200.00, | $1,200.00 |

| | | | |
|---|---|---|---|
| 5149 7th Ave | SFR private rental | $1,800.00, | $1,800.00 |
| 7214 10th Ave | SFR private rental | $1,200.00, | $1,200.00 |
| | | Total $ 32,450.00 | $ 20.050.00 |

Currently, the principal assets include 8 rental properties in South Los Angeles. Some of the units are occupied by relatives of the Debtor at market rate rents. The balance of the units are available for rent by those referred by social service agencies as sober living facilities.

The property at 4th Avenue is two story. The lower half of which is used by the Debtor for her child care business. Also, she has three foster children that she cares for with the costs being paid by Los Angeles County. The Debtor uses the upper floor for her personal residence.

Due to the financial crisis that has engulfed the country, all of the properties have a fair market value less than the amount of the debt. The reorganization plan deals with this disparity by allocating a portion of the value of the properties to unsecured debt. Three of the properties have second trust deeds that are wholly impaired. These three trust deeds are allocated to unsecured debt.

By allocating the debt and modifying the first trust deeds to a lower interest rate with lower payments, the Debtor will have a viable business that will make a profit.

3.      The Future of the Debtor's Business.


        The reorganization plan offers the best alternative to converting the
Debtor's assets into a viable business model.  The only alternative is to file a
Chapter 7 where the creditors will receive a fraction of their debt and the
Debtor will lose her business.


4.      Sources of Information.


        The information herein and in the reorganization plan is based on the
Debtor's hands on experience with the business. The amount of the debts are
taken from the notes and trust deeds that are securing the properties.  The
estimated operating expenses are based on the experience of the Debtor in
operating this business. The fair market values of the properties is based on
broker opinion that have been furnished in connection with preparation of
the Plan.


5.      Disclaimer.


        No statements or information concerning the debtor are authorized
except as disclosed in this statement.


6.      The debtor filed this proceeding on October 2, 2009. There were two
prior proceedings that were filed with prior counsel and were dismissed prior
to this proceeding being filed.  Since filing, the Debtor has continued to
operate and filed the necessary reports with the U.S. Trustees Office.


7.      Claims filed against the Estate.

1    The claims filed against the estate include the following.

2

3    1.    A claim by the Internal Revenue Service claiming that income

4  taxes for the debtor were not filed nor paid.  This claim resulted from an

5  error in the electronic filing system of the IRS.  The Debtor had paid the

6  taxes for the year 2008.  She met personally with the IRS on December 11,

7  2009, and rectified the error.   The Debtor anticipates that the claim will be

8  withdrawn.

9

10    2.    A claim by Wells Fargo Bank which is one of the secured

11  lenders.  The claim is treated along with other Class 3 claims under the plan.

12

13    3.    The Debtor knows of no other claims that have been filed as of

14  this date.

15

16  8.    Liquidation Analysis.

17

18    With respect to the claims that are secured by the properties a

19  foreclosure would result in the lender receiving the property at its fair market

20  value less the cost of foreclosure and carrying. The estimated amount the

21  Class 3 creditors would receive is equal $ 1,506,000.

22

23    In the Plan, the Debtor proposes that the loan payments on the Class 4

24  claims (4th street property) where the Debtor resides be adjusted.  With

25  adjustment, the Debtor will be able to pay the adjusted amounts and retain

26  the property.

27

28    The unsecured creditors will be paid pro-rata at the rate of 5% of the

Case 2:09-bk-36912-BR   Doc 45   Filed 12/15/09   Entered 12/15/09 11:05:39   Desc
Main Document    Page 12 of 15

amount of said Class of claims. The adjustments to the loans and payments will allow the Plaintiff to make these payments which will be more than they would receive on an outright Chapter 7 bankruptcy.

9.      Accounting Methods.

        The projections are made on a cash basis. The loan payments under the plan have been determined by tables of standard loan amortization for 30 year loans at designated interest rates.

10.     Future Management of the Debtors's business.

        The Debtor plans to manage the business without compensation until such time as there is net income from operations. The Debtor will continue to operate her child care business which will meet her basic living expenses.

11.     Summary of the Reorganization Plan.

Class 1 Claims.    These are property tax claims of the County of Los Angeles.  The debtor will pay these from income as they become due.

Class 2 Claims.    There are no allowed claims.

Class 3 Claims.    The impaired portion of these claims will be allocated to Class 6 claims and paid at the same rate as other Class 6 claims.  The secured portion consisting of first trust deed notes on 8 properties will be restructured on the basis of

current market rates of interest on 30 years fully
amortized loans. Any arrears will be allocated to Class 6
claims and paid at the same rate as  the other Class 6
claims.

Class 4 Claims.    There are three second trust deeds that are totally
impaired.  These claims will be allocated to Class 6
claims and paid at the same rate as  the other Class 6
claims.

Class 5 Claims.    This is a partially secured claim on the Debtor's
residential property.  The terms of the loan will be
modified and paid according to the modified terms.

Class 6 Claims.    Unsecured claims will be paid pro rata at the rate of 5%
of the total claim per year for a period of 5 years.

12.    An estimate of the administrative fees for five years are:

| | | |
|---|---|---|
| U.S. Trustee's fees | $ | 5,000 |
| Attorneys Fees | | 25,000 |
| Bookkeeping Assistance | | 5,000 |
| Total | $ | 35,000 |

These fees will be paid from net income over a 5 year period that
becomes available during the course of the reorganization.

13.     Collection of Accounts Receivable.

        The Debtor has no accounts receivables.

14.     Basis for Evaluation.

        The current market value of the Debtor's properties is based on broker's opinions obtained by the Debtor.  The costs of financing currently are based on existing notes and on future financing by quoted payment schedules obtained from lenders currently making loans as sought by the Debtor.

15.     Risks of Approving the Reorganization Plan.

        The Debtor has been able to operate her business in a limited way hampered by the recession and burdensome loan terms.  The plan will adjust the amounts of the secured debts based on current real property values.  The Debtor believes that she should be able to achieve a near full capacity of her sober living business with adjustment of the loan terms.  The risk to the creditors is that the Debtor will not be able to achieve these goals. The alternative is a Chapter 7 bankruptcy where the creditors will receive only the liquidation value of their interests.  The unsecured creditors will receive nothing.  Given these facts, the creditors will be better off by accepting the plan than liquidating their loan positions.  Three of the eight properties are occupied by relatives of the Debtor.  It is anticipated the relatives will continue to occupy these properties.  These relatives are paying market rate rents and will continue to do so.  If the event they cannot afford to pay the rent, they will be evicted and the property rented to non-relatives.

16.    Avoidable Transfers.

       There are no avoidable transfers.

17.    Tax Consequences of the Reorganization Plan.

       Each creditor must determine the tax effect of the reorganization on its business. The Debtor is advised that the reorganization plan will have less of an adverse effect of the creditors than a Chapter 7 liquidation. The Debtor is advised that tax effects will be similar to what the creditors would experience in a Chapter 7 bankruptcy.

18.    The Relationship of the Debtor and her Affiliates.

       The relationship of the Debtor and her affiliates is described in Paragraph 1, History of the Debtor's business. Three of the properties are occupied by relatives of the Debtor who are paying current market rate rents for their units and are current on their rental payments.

Respectfully submitted,

_____
Orlanda Cunningham
Debtor in Possession