Cameron H. Totten, Esq. (SBN 180765)
Law Offices of Cameron H. Totten
620 N. Brand Blvd., Ste. 405
Glendale, California  91203
Telephone (818) 483-5795
Facsimile (818) 230-9817
ctotten@ctottenlaw.com

Attorney for Debtor in Possession Orlanda Cunningham

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Chapter    11 |
| ORLANDA CUNNINGHAM, | CASE NO.  2:09–bk–36912–BR |
| Debtor. | DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 FIRST AMENDED PLAN OF REORGANIZATION |

### Disclosure Statement Hearing

Date:  June 22, 1010
Time: 10:00 a.m.
Ctrm: 1668, 16th Floor
　　　US Bankruptcy Court
　　　Roybal Federal Building
　　　225 E. Temple Street
　　　Los Angeles, CA 90012

### Plan Confirmation Hearing

Date:  June 22, 1010
Time: 10:00 a.m.
Ctrm: 1668, 16th Floor
　　　US Bankruptcy Court
　　　Roybal Federal Building
　　　225 E. Temple Street
　　　Los Angeles, CA 90012

THE HONORABLE BARRY RUSSELL

---

DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT

1

Debtor in Possession ORLANDA CUNNINGHAM ("Debtor") hereby submits her First Amended Disclosure Statement Describing her Chapter 11 First Amended Plan of Reorganization as follows.

## I.   INTRODUCTION

On October 2, 2009, Debtor commenced this bankruptcy case by filing a Chapter 11 petition under the United States Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. § 101 et seq., which allows the Debtor, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization ("Plan"). The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. Debtor is the party proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

This is a reorganization plan. In other words, the Debtor seeks to accomplish payments under the Plan from income generated by the ongoing operation of her businesses.

### A.   Purpose of This Document

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan. READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

(1)   WHO CAN VOTE OR OBJECT,

(2)   WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM

1    WOULD RECEIVE IN LIQUIDATION,

2         (3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT

3    EVENTS DURING THE BANKRUPTCY,

4         (4)    WHAT THINGS THE COURT WILL LOOK AT TO

5    DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,

6         (5)    WHAT IS THE EFFECT OF CONFIRMATION, AND

7         (6)    WHETHER THIS PLAN IS FEASIBLE.

8         This Disclosure Statement cannot tell you everything about

9    your rights.  You should consider consulting your own lawyer to obtain

10   more specific advice on how this Plan will affect you and what is the

11   best course of action for you.

12        Be sure to read the Plan as well as the Disclosure Statement.  If

13   there are any inconsistencies between the Plan and the Disclosure

14   Statement, the Plan provisions will govern.

15        The Code requires a Disclosure Statement to contain

16   "adequate information" concerning the Plan.  The Bankruptcy Court

17   ("Court") has tentatively approved this document as an adequate

18   Disclosure Statement, containing enough information to enable parties

19   affected by the Plan to make an informed judgment about the Plan. Any

20   party can now solicit votes for or against the Plan.

21   **B.    <u>Deadlines for Voting and Objecting; Date of Plan</u>**

22   **<u>Confirmation Hearing</u>**

23        THE COURT HAS NOT YET CONFIRMED THE PLAN

24   DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER

25   WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON

26   ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE

27   PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR

28

AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

### 1.    Time and Place of the Confirmation Hearing

The hearing where the Court will determine whether or not to confirm the Plan will take place on June 22, 2010, at 10:00 a.m., in Courtroom 1668 of the United States Bankruptcy Court, Roybal Federal Building, 225 E.  Temple Street, Los Angeles, CA 90012.

### 2.    Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Cameron H.  Totten, Esq., Law Offices of Cameron H.  Totten, 620 N. Brand Blvd., Ste.  405, Glendale, CA 91203.

Your ballot must be received by June 21, 2010, at 5:00 p.m., or it will not be counted.

### 3.    Deadline For Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon the Debtor, Trustee, any committee appointed under the Bankruptcy Code, counsel for any of the foregoing, and any other entity as ordered by the Court by June 8, 2010.

### 4.    Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel for Debtor: Cameron H.  Totten, Esq.; Law Offices of Cameron H.  Totten; 620 N.  Brand Blvd., Ste.  405, Glendale, CA 91203; (818) 483-5795 (tel); (818) 230-9817 (fax); ctotten@ctottenlaw.com.

---

### C.    Disclaimer

The financial data relied upon in formulating the Plan and contained in this Disclosure Statement was provided by the Debtor. The Debtor represents that everything stated in the Disclosure Statement is true to the Debtor's best knowledge.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

## II.    BACKGROUND OF DEBTOR'S BUSINESS

Debtor is a sole proprietor who has been self employed for the past 20 years. She received her State of California Real Estate License in 1989 while she was employed as a business sales representative for Pacific Bell.  Debtor worked part-time for various major real estate companies until she became a full-time real estate sales person for JLA Realty in Westwood.  Debtor's Real Estate License is currently "NBA". This means "No Current Employing Broker".  Debtor has her license for Family Day Care and Foster Care License.

Debtor purchased her first home in 1994 for $35,000.  This property is located at 7214 10th Avenue, Los Angeles, CA.  This property was in need of a total rehabilitation from the foundation to the roof.  Debtor was credit worthy to qualify for financing and refinance of the loan on this property.  Debtor refinanced this property in September of 2005 for $266,000.00.  Debtor received a sub-prime loan even though she qualified for a prime loan. The funds received from the refinance were used for needed repairs on this and the other properties. The property was lost in a foreclosure sale in April 2010 and is no longer part of Debtor's plan of reorganization.  Debtor believes that the property is currently owned by Aurora Loan Services, LLC.  There is

pending litigation in Los Angeles Superior Court regarding this property.

In August 1996, the Debtor purchased the property at 4711-13 4th Avenue, Los Angeles.  The property was a bank foreclosure and Debtor was credit worthy to qualify for the loan.  The property was larger than the Debtor needed for her family and plans were formulated to provide services to children and families at the property.  Debtor received her State of California family daycare license in 1997 and she eventually operated a full time daycare facility.  Debtor was licensed for 14 children. The property was large enough to use the downstairs (4713 4th Avenue) fully as a daycare center and the upstairs (4711 4th Avenue) as her living quarters.

Debtor received her State of California License foster care business in 1999 for the address 4711 4th Ave (upstairs).  Debtors' capacity is for six children ages 12-18, boys only.  Debtor has been at full capacity at various times throughout the past ten years.  Debtor currently has legal guardianship of three boys ages 13, 14, and 15. Debtor refinanced this property in January of 2007 for $750,000.00. Debtor received a sub-prime loan even though she qualified for prime financing.  The funds from this loan was used to pay-off debts and purchase another property for income purposes.

In May of 2002, Debtor took over payments of 5728 10th Avenue, Los Angeles, CA, from a friend that was in foreclosure.  Debtor's biological son moved into the property.  He pays approximately $1,000.00 per month for rent to the Debtor.  Debtor claimed this property as her second residence. The property was badly in need of rehabilitation from the foundation to the roof.   Debtor refinanced this

home.  With the assistance of her children, most of the repairs were completed except for a pool that was too expensive to fix.

Debtor purchased 5459 10th Avenue, Los Angeles, CA, in February of 2005 because it was more suitable for the Debtor to live in. Debtor was very credit worthy and the financing was affordable. Debtor refinanced this property.  Debtor's daughter was living in 4711-13 4th Avenue, working and paying rent to the Debtor. Accordingly, Debtor moved into the 5459 10th Avenue, Los Angeles, CA property.  Debtor's son and daughter were certified, fingerprinted and trained in CPR/First aid to assist the Debtor in operating businesses, foster care and daycare.  In 2003, the daycare business was good but with the recent recession, the business activity has declined substantially.  Debtor believes that it will return to former more profitable levels as the economy improves.

Debtor and her youngest biological son took a class on operating a sober living business in August of 2006 from the Sober Living Network.  Sober Living appeared to present a solid for future business opportunities.  The property at 1851 W. 85th Street, Los Angeles was purchased in August of 2006 for the purpose of operating a sober living home.  The property at 1851 W. 85th Street was first leased to the H.O.W. Foundation which operates transition housing services.  This foundation leased this property for about one year but failed to pay their rental obligation on time. They were asked to leave.

Debtor purchased 1246 W. 68th Street, Los Angeles, CA, in April of 2007 because the seller offered her a sale with credit in the financing. This property was also leased to the H.O.W. Foundation.  They were asked to move because of their neglect to honor their lease agreement.

---

DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT

Debtor, with the assistance of her son, started operating Sober Living/Transitional Housing homes in 2007.  Debtor furnished the 85th Street property with 20 beds and the 68th Street property with 10 beds. In February of 2007, Debtor purchased 5149 7th Avenue for the purpose of opening another Sober Living home. This home was furnished with 16 beds.  Debtor later moved the sober living clients to the 68th Street property because the capacity was low and she was able to move a private party, her biological daughter, into this property.

In March of 2007, Debtor was credit worthy and purchased 2200 W 73rd Street, Los Angeles, CA, a duplex, that was to be used for Sober Living/Transitional Housing.  This home was furnished with 30 beds. Debtor has received approval from the L.A. County Probation department to house homeless probation participants under a program they were funding.  Unfortunately, the programs funding ran out in late 2007.

Debtor purchased 1814 New England Street, Los Angeles, CA, in August 2007, looking at its potential to be resold at a later date for a profit.  Debtor submitted plans and received permits to rehabilitate the property.  The property was partially vacant when it was purchased. Debtor found new tenants. However, in early 2008, the tenants started having problems paying the rent.  Debtor presently has two units set up for sober/ transitional housing with 10 beds.

When the housing market started falling in 2007, Debtor asked for loan modifications from her lenders but was told she was not having a problem because she was paying all her debts timely.  Debtor sought help from professional loan modification companies later in 2008. The Debtor spent approximately $30,000 for loan modification services

1    without results.

2         Debtor has filed litigation against some of these companies and

3    filed State Bar Association complaints against attorney Mark Nelson

4    who defrauded her.  In that regard, Debtor met with Homeowners

5    Advisory Council of Ontario in May of 2009 for expert help with loan

6    modifications.  She was advised a Chapter 11 Bankruptcy would

7    accomplish her need to modify her loans. She was told that they had an

8    experienced attorney, Mark Nelson, who would make the process quick

9    and efficient.  She was told that she did not need to make any more

10   payments until the bankruptcy was completed.  Debtor paid $6,500 for

11   this service.

12        Debtor was contacted by a San Bernardino District Attorney

13   investigator, M. Ladrum, who stated that the principals of Homeowners

14   Advisory Council had been arrested for fraud with a box of her personal

15   papers.  The pending criminal case is FSB902405.  Debtor followed up

16   with Mr. Nelson, the attorney named on her bankruptcy papers.  Debtor

17   never met Mr. Nelson and never signed any bankruptcy papers for Mr.

18   Nelson.  She never received any notice of case deficiencies.  Later, Mr.

19   Nelson told the Debtor that he was a victim of the owners of HAC also.

20   He represented that he was committed to the case and would complete

21   the filings.  However, he stated he did not have the money to do so.

22   Accordingly, Mr. Nelson was paid another $6,500.00 but did not

23   complete the filing.  Debtor met with attorney Cameron Totten who

24   agreed to assist with her Chapter 11 Bankruptcy.  Debtor intends to file

25   a claim for refund of attorneys fees against Mr.  Nelson and the

26   principals of Homeowners Advisory Council.

27        The Debtor is basing her reorganization on her Sober Living

28

Transitional Housing business.  Demand for quality sober housing far exceeds supply. That is particularly true for housing that is accessible to those of limited or modest means.  Debtor has received approvals from local housing agencies, the State of California department of Social Services, State of California Parole, Los Angeles County Probation, Veterans Administration, Los Angeles County Department of Mental Health and various local homeless agencies.

Debtor has developed a reputation for "dignity in living" homes. The sober living housing business has good potential for future growth. Because Sober Loving homes are neither boarding houses nor commercial enterprises, they cannot be classified as such by local governments.  Local governments cannot require zoning or land use permits or restrictions for a residence that is not required to be licensed which is not also imposed on all residences in the jurisdiction. Therefore, no business license or permit is required by the City of Los Angeles where the properties are located.

Sober Living residences are houses where people abstain from alcohol and drugs and seek a clean and sober living environment.  There are no treatment or counseling services given.  The Sober Living Homes are considered the same as any other residential rental.  They exist by right, just as any single family dwelling unit, whether it is a single family home, a unit in a duplex, a large apartment complex, or other types of dwelling units.

Sober living homes are considered nondiscriminatory because the standards apply equally to everyone and are, therefore, generally exempt from the application of fair housing laws. Federal and state fair housing laws provide protections from housing discrimination for persons with

disabilities.

Disabilities, according to fair housing laws, include, but are not limited to, the mentally ill and those addicted to alcohol and other drugs. Housing includes licensed residential treatment programs as well as sober living and other independent living homes where individuals with disabilities reside as a family for an extended period as opposed to an overnight or "hotel" situation.

Debtor's facilities are designed to be a sober/ transitional living situation, helping people rehabilitate back into society, back to their families, and on to reach their God given potential.  Debtor sets no time limit for this transition.  All residents are expected to have completed a treatment program or are to be currently in an outpatient program. Transitional housing clients do not have these requirements but must be committed to practice sobriety.

**III.    SUMMARY OF THE PLAN OF REORGANIZATION**

   **A.    What Creditors and Interest Holders Will Receive
            Under The Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

   **B.    Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, Debtor has not placed the following claims in a class.

## 1.    <u>Administrative Expenses</u>

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507(a)(1).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.  The amount of the administrative claims will be determined at a later date but are estimated to be approximately $5,000 in Trustee's Fees and Court Fees and $40,000 in attorney's fees.  The Court must rule on all administrative claims.  For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application.  Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.  If the Plan is confirmed, Counsel for Debtor has agreed to allow for the payment of attorney's fees in 60 equal monthly payments.

## 2.    <u>Priority Tax Claims</u>

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8)40.  The Code requires that each holder of such a 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the assessment of such tax.  There are, and will be, property tax claims of the County of Los Angeles.  Debtor will pay these from income as they become due.

Class 6 Claims. Unsecured claims will be paid pro rata at the rate of 5% of the total claim per year for a period of 5 years.

///

///

## C.   Classified Claims and Interests

### 1.   Classes of Secured Claims

Secured claims are claims secured by liens on property of the estate. The following summarizes all classes containing Debtor's secured pre-petition claims and their treatment under the Plan.

Class 3 Claims. The impaired portion of these claims will be allocated to Class 6 claims and paid at the same rate as other Class 6 claims. The secured portion consisting of first trust deed notes on 8 properties will be restructured on the basis of current market rates of interest on 30 years fully amortized loans. Any arrears will be allocated to Class 6 claims and paid at the same rate as the other Class 6 claims.

Class 4 Claims. There are six second trust deeds that are totally impaired. These claims will be allocated to Class 6 claims and paid at the same rate as the other Class 6 claims.

Class 5 Claims. This is a partially secured claim on the Debtor's residential property. The terms of the loan will be modified and paid according to the modified terms.

### 2.   Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7)51 are required to be placed in classes.  These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.  There are no priority unsecured claims.

### 3.   Class of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a).  The following summarizing the treatment of general unsecured claims.

Class 6 Claims. Unsecured claims will be discharged in 60 equal monthly payments of an amount equal to 5% of the total of all claims. At the conclusion of these payments, any remaining balance will be discharged.

### 4.    Class(es) of Interest Holders

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor.  If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders.  If the Debtor is a partnership, the interest holders include both general and limited partners.  If the Debtor is an individual, the Debtor is the interest holder. Here, Debtor is an individual and is the only interest holder.

### D.    MEANS OF EFFECTUATING THE PLAN

Debtor plans to make payments required under the Plan from revenue available from future operations.  As shown below and in the Plan, Debtor is projecting an operating profit after modification of the first trust deed loans and discharge of the second trust deed loans that are now unsecured. The operative loss, excludes professional expenses and filing fees incurred in this case.  Upon request the Debtor will provide copies of monthly operating reports filed with the Court.

### 1.    Projected Income of Properties

Debtor is engaged in a sober living business, child care and rental housing. The properties utilized for sober living and child care are: Property Address, Total Beds, Income at Full Capacity and Current level:

2200 W 73rd 5t,    20 sober living beds,    $8,000.00        $4,000.00

1246 W 64th 5t    10 sober living beds,    $4,000.00        $2,000.00

---

DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT
14

| | | | |
|---|---|---|---|
| 1851 W 85th 5t | 20 sober living beds, | $8,000.00 | $4,000.00 |
| 1814-16 New England Ave. | 10 beds | $1,600.00 | $1,600.00 |
| 1818-20 New England St., | Private rentals | $2,450.00 | $2,450.00 |
| 5459 10th Ave | SFR private rental | $1,800.00 | $1,800.00 |
| 5728 10th Ave | SFR private rental | $1,200.00 | $1,200.00 |
| 5149 7th Ave | SFR private rental | $1,800.00, | $1,800.00 |
| Total | | $ 28,850.00 | $ 18,850.00 |

Currently, the principal assets include 8 rental properties in South Los Angeles. Some of the units are occupied by relatives of the Debtor at market rate rents. The balance of the units are available for rent by those referred by social service agencies as sober living facilities. The property at 4711 4th Avenue is two story. The lower half of which is used by the Debtor for her child care business. Also, she has three foster children that she cares for with the costs being paid by Los Angeles County. Debtor uses the upper floor for her personal residence.

Due to the financial crisis that has engulfed the country, all of the properties have a fair market value less than the amount of the debt. The reorganization plan deals with this disparity by allocating a portion of the value of the properties to unsecured debt. Three of the properties have second trust deeds that are wholly impaired. These three trust deeds are allocated to unsecured debt.

By allocating the debt and modifying the first trust deeds to a lower interest rate with lower payments, the Debtor will have a viable business that will make a profit.

///

### 2.    Accounting Methods

The projections are made on a cash basis. The loan payments under the plan have been determined by tables of standard loan amortization for 30 year loans at designated interest rates.

### 3.    The Future of the Debtor's Business

The reorganization plan offers the best alternative to converting the Debtor's assets into a viable business model. The only alternative is to file a Chapter 7 where the creditors will receive a fraction of their debt and the Debtor will lose her business.

### 4.    Future Management of the Debtor's Business

Debtor plans to manage the business without compensation until such time as there is net income from operations.  Debtor will continue to operate her child care business which will meet her basic living expenses.

### 5.    Sources of Information

The information herein and in the reorganization plan is based on the Debtor's hands on experience with the business. The amount of the debts are taken from the notes and trust deeds that are securing the properties.  The estimated operating expenses are based on the experience of the Debtor in operating this business.  The fair market values of the properties is based on broker opinions that have been furnished in connection with preparation of the Plan.

### 6.    Disclaimer

No statements or information concerning the debtor are authorized except as disclosed in this statement.  Debtor filed this proceeding on October 2, 2009. There were two prior proceedings that were filed with prior counsel and were dismissed prior to this proceeding being filed.  Since filing, Debtor has continued to operate and filed the necessary reports with the U.S.

1  Trustees Office which are available from Counsel for Debtor upon request.

2  **E.    RISK FACTORS**

3  Debtor has been able to operate her business in a limited way

4  hampered by the recession and burdensome loan terms.  The Plan will

5  modify the amounts of the secured debts based on current real property

6  values.  The Debtor believes that she will be able to achieve a near full

7  capacity of her sober living business with adjustment of the loan terms. The

8  risk to the creditors is that Debtor will not be able to achieve these goals. The

9  alternative is a Chapter 7 bankruptcy where the creditors will receive only

10  the liquidation value of their interests. The unsecured creditors will receive

11  nothing.  Given these facts, the creditors will be better off by accepting the

12  Plan than liquidating their loan positions.  Three of the eight properties are

13  occupied by relatives of the Debtor.  It is anticipated the relatives will

14  continue to occupy these properties.  These relatives are paying market rate

15  rents and will continue to do so. If the event they cannot afford to pay the

16  rent, they will be evicted and the property rented to non-relatives.

17  **F.    TAX CONSEQUENCES OF THE PLAN**

18  CREDITORS AND INTEREST HOLDERS CONCERNED WITH

19  HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD

20  CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS,

21  AND/OR ADVISORS.  The following disclosure of possible tax

22  consequences is intended solely for the purpose of alerting readers about

23  possible tax issues this Plan may present to the Debtor.  The Proponent

24  CANNOT and DOES NOT represent that the tax consequences contained

25  below are the only tax consequences of the Plan because the Tax Code

26  embodies many complicated rules which make it difficult to state completely

27  and accurately all the tax implications of any action.  Each creditor must

28

determine the tax effect of the reorganization on its business.

Debtor is advised that the reorganization plan will have less of an adverse effect of the creditors than a Chapter 7 liquidation. Debtor is advised that tax effects will be similar to what the creditors would experience in a Chapter 7 bankruptcy.

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.

The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements are not the only requirements for confirmation.

### A.    Who May Vote or Object

#### 1.    Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

#### 2.    Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed

---

for voting purposes and (2) classified in an impaired class.

### a.    <u>What Is an Allowed Claim/Interest</u>

As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. Consult Exhibits F through L to see how the Proponent has characterized your claim or interest.

### b.    <u>What Is an Impaired Claim/Interest</u>

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, Debtor believes that classes 3, 4 and 5, are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.  Debtor believes that class 1 is unimpaired and that

---

holders of claims in this class therefore does not have the right to vote to accept or reject the Plan.  Parties who dispute the Debtor's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

### 3.    <u>Who is Not Entitled to Vote</u>

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8)76; and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code.  Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.    <u>Who Can Vote in More Than One Class</u>

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5.    <u>Votes Necessary to Confirm the Plan</u>

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes

---

1  of any insiders within that class, and (2) all impaired classes have voted to

2  accept the Plan, unless the Plan is eligible to be confirmed by "cramdown"

3  on non-accepting classes, as discussed later in Section {IV.A.8.}.

### 6.    Votes Necessary for a Class to Accept the Plan

5      A class of claims is considered to have accepted the Plan

6  when more than one-half (1/2) in number and at least two-thirds (2/3) in

7  dollar amount of the claims which actually voted, voted in favor of the Plan.

8  A class of interests is considered to have accepted the Plan when at least

9  two-thirds (2/3) in amount of the interest-holders of such class which

10 actually voted, voted to accept the Plan.

### 7.    Treatment of Nonaccepting Classes

12     As noted above, even if all impaired classes do not accept the

13 proposed Plan, the Court may nonetheless confirm the Plan if the

14 nonaccepting classes are treated in the manner required by the Code.  The

15 process by which nonaccepting classes are forced to be bound by the terms

16 of the Plan is commonly referred to as "cramdown."  The Code allows the

17 Plan to be "crammed down" on nonaccepting classes of claims or interests if

18 it meets all consensual requirements except the voting requirements of

19 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and

20 equitable" toward each impaired class that has not voted to accept the Plan as

21 referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

24     The party proposing this Plan asks the Court to confirm this Plan by

25 cramdown on impaired classes if any of these classes do not vote to accept

26 the Plan.  Please note that the proposed Plan treatment described by this

27 Disclosure Statement cannot be crammed down on the following classes: 1.

28

AS A RESULT, IF ANY OF THESE CLASSES DOES NOT VOTE TO ACCEPT THE PLAN, THE PLAN WILL NOT BE CONFIRMED.

**B.      LIQUIDATION ANALYSIS**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for the following reasons.

With respect to the claims that are secured by the properties, a foreclosure would result in the lender receiving the property at its fair market value less the cost of foreclosure and carrying. The estimated amount the Class 3 creditors would receive is equal $ 1,506,000.

In the Plan, Debtor proposes that the loan payments on the Class 4 claims (4711 4th Avenue property) where the Debtor resides be adjusted. With the adjustment, Debtor will be able to pay the adjusted amounts and retain the property.  The unsecured creditors will be paid pro-rata at the rate of 5% of the amount of said Class of claims. The adjustments to the loans and payments will allow the Plaintiff to make these payments which will be more than they would receive on an outright Chapter 7 liquidation.

In a Chapter 7 liquidation, the general unsecured creditors and second trust deed holders will not receive any payments.  The holders of first trust deeds will receive principal and interest over 30 years as proposed in the Plan.  Any uncured portion of the first trust deeds will be written off.

## C.    **FEASIBILITY**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.  There are at least two important aspects of a feasibility analysis.

The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date.  The Plan Proponent maintains that this aspect of feasibility is satisfied as it will have approximately $40,000 in cash on the Effective Date of the Plan.  The second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments.  As set forth above and in the Plan, if the secured debt is reduced, the operation of the business will produce sufficient income to make the required Plan.

# V.

## EFFECT OF CONFIRMATION OF PLAN

### A.   DISCHARGE

This Plan provides that upon payment in full of proposed plan payments to the unsecured creditors, Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C.§ 1141.  However, the discharge will not discharge any liability imposed by the Plan.

### B.   REVESTING OF PROPERTY IN THE DEBTOR

The confirmation of the Plan revests all of the property of the estate in the Debtor.

### C.   MODIFICATION OF PLAN

The Proponent of the Plan may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or revoting on the Plan.  The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

### D.   POST-CONFIRMATION STATUS REPORT

Within 120 days of the entry of the order confirming the Plan, Debtor shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice. Further status reports shall be filed every 120 days and served on the same entities.

### E.   QUARTERLY FEES

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) to date of

---

confirmation shall be paid to the United States Trustee on or before the effective date of the plan.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States Trustee in accordance with 28 U.S.C. § 1930(a)(6) until entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.

## F.    POST-CONFIRMATION CONVERSION/DISMISSAL

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  If the Court orders, the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7, estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

## G.    FINAL DECREE

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, Debtor, or other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.

DATED: May 17, 2010          LAW OFFICES OF CAMERON H. TOTTEN

By:_____/s/ Cameron H. Totten_____
              Cameron H. Totten
              Attorney for Debtor

---

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.

Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 620 N. Brand Blvd., Ste. 405, Glendale, CA 91203

A true and correct copy of the foregoing document described **DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 FIRST AMENDED PLAN OF REORGANIZATION**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On May 18, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Gilbert B. Weisman II (notices@becket-lee.com); Joe M. Lozano, Jr. (notice@NBSdefaultservices.com); Christopher M. McDermott, Joseph C Delmotte, Angela Fontanini & Caspar Rankin (ecfcacb@piteduncan.com); Cassandra Richey & David F. Makkabi (cmartin@pprlaw.net); John D. Schlotter (bkmail@mrdefault.com); Ramesh Singh (claims@recoverycorp.com); Alan Steven Wolf (wdk@wolffirm.com); Les A. Zieve (bankruptcy@zievefirm.com); Russell Clementson (russell.clementson@usdoj.gov); Matthew Duarte (mduarte@mccarthyholthus.com); Nichole Glowin (nglowin@wrightlegal.net, bkgroup@wrightlegal.net); Donna L. LaPorte (dlaporte@wrightlegal.net, bkgroup@wrightlegal.net); Ian Landsberg (ilandsberg@lm-lawyers.com, bgomelsky@landsberg-law.com, rbenitez@landsberg-law.com); Matthew Podmenik (lrodriguez@mccarthyholthus.com); Melissa Robbins (mrobbins@mccarthyholthus.com, rnguyen@mccarthyholthus.com); United States Trustee (LA) (ustpregion16.la.ecf@usdoj.gov); Laurie Howell (laurie.howell@dre-apc.com).
☐ Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
See concurrently filed Certificate of Service.

☐  Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on May 18, 2010, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Judge Barry Russell, 255 E. Temple Street, Suite 1660, Los Angeles, CA  90012-3332

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 18, 2010 | Cameron H. Totten | /s/ Cameron H. Totten |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT